IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES WILSON, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | CASE NO. 3:17-cv-307-WC [wo] |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | ) ) ) ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION AND ORDER**

On April 17, 2014, James Wilson applied for Supplemental Security Income (SSI) and disability insurance benefits under Title II of the Social Security Act alleging a disability date of November 19, 2013. (R. 168-178). His application was denied on August 20, 2014. (R. 94). Wilson timely filed a request for hearing before the Administrative Law Judge ("ALJ"). (R. 106). Following a hearing, the ALJ rendered an unfavorable decision on April 29, 2016. (R. 9). The Appeals Council denied Plaintiff's request for review. (R. 1-7). As a result, the ALJ's decision became the final decision of the Commissioner of Social Security. *Id.* Judicial review proceeds pursuant to 42 U.S.C. § 405(g), and 28 U.S.C. § 636(c). After careful scrutiny of the record and briefs, for reasons herein explained, the Court **REVERSES AND REMANDS** the Commissioner's decision.

### **I. NATURE OF THE CASE**

Wilson seeks judicial review of the Commissioner's decision denying his application for disability insurance benefits and social security income. United States District Courts may conduct limited review of such decisions to determine whether they

comply with applicable law and are supported by substantial evidence. 42 U.S.C. § 405. The Court may affirm, reverse and remand with instructions, or reverse and render a judgment. *Id*.

## II. STANDARD OF REVIEW

The Court's review of the Commissioner's decision is a limited one. The Court's sole function is to determine whether the ALJ's opinion is supported by substantial evidence and whether the proper legal standards were applied. *See Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). "The Social Security Act mandates that 'findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive.'" *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (quoting 42 U.S.C. § 405(g)). Thus, this Court must find the Commissioner's decision conclusive if it is supported by substantial evidence. *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *Foote*, 67 F.3d at 1560 (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982)).

If the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the court would have reached a contrary result as finder of fact, and even if the evidence preponderates against the Commissioner's findings. *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003); *Edwards v. Sullivan*, 937 F.2d 580, 584

n.3 (11th Cir. 1991) (quoting *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)). The Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560 (citing *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The Court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]," but rather it "must defer to the Commissioner's decision if it is supported by substantial evidence." *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1997) (quoting *Bloodsworth*, 703 F.2d at 1239).

The Court will also reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). There is no presumption that the Commissioner's conclusions of law are valid. *Id.*; *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991) (quoting *MacGregor*, 786 F.2d at 1053).

### III. STATUTORY AND REGULATORY FRAMEWORK

The Social Security Act's general disability insurance benefits program ("DIB") provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. § 423(a). The Social Security Act's Supplemental Security Income ("SSI") is a separate and distinct program. SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. Eligibility for SSI is based upon proof of indigence and disability. *See* 42

U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C). However, despite the fact they are separate programs, the law and regulations governing a claim for DIB and a claim for SSI are identical; therefore, claims for DIB and SSI are treated identically for the purpose of determining whether a claimant is disabled. *Patterson v. Bowen*, 799 F.2d 1455, 1456 n.1 (11th Cir. 1986). Applicants under DIB and SSI must prove "disability" within the meaning of the Social Security Act, which defines disability in virtually identical language for both programs. *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a). A person is entitled to disability benefits when the person is unable to

> Engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security employs a five-step, sequential evaluation process to determine whether a claimant is entitled to benefits. *See* 20 C.F.R. §§ 404.1520, 416.920 (2010). The five steps are as follows:

(1) Is the person presently unemployed?

(2) Is the person's impairment(s) severe?

(3) Does the person's impairment(s) meet or equal one of the specific impairments

> set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?[1]
>
> (4) Is the person unable to perform his or her former occupation?
>
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

The burden of proof rests on a claimant through Step Four. *See Phillips v. Barnhart*, 357 F.3d 1232, 1237-39 (11th Cir. 2004). Claimants establish a prima facie case of qualifying for disability once they meet the burden of proof from Step One through Step Four. At Step Five, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform. *Id*.

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity ("RFC"). *Id*. at 1238-39. RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence. *Id*. It also can contain both exertional and nonexertional limitations. *Id*. at 1242-43. At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform. *Id*. at 1239. To do this, the ALJ can either use the Medical Vocational Guidelines[2] ("grids") or hear testimony from a vocational expert ("VE"). *Id*. at 1239-40.

---

[1] This subpart is also referred to as "the Listing of Impairments" or "the Listings."

[2] *See* 20 C.F.R. pt. 404 subpt. P, app. 2; *see also* 20 C.F.R. § 416.969 (use of the grids in SSI cases).

The grids allow the ALJ to consider factors such as age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and lack of job experience. Each factor can independently limit the number of jobs realistically available to an individual. *Id.* at 1240. Combinations of these factors yield a statutorily-required finding of "Disabled" or "Not Disabled." *Id*.

### IV. MEDICAL HISTORY

On February 8, 2001, Wilson was struck by a forklift while at work. (R. 278). An MRI taken of the lumbar spine on March 2, 2001 was unremarkable. (R. 429). He filed a workman's compensation claim and was treated at the Hughston Clinic until he was released back to work on March 13, 2001. (R. 278). X-rays document "some midlevel cervical arthritis but no acute fractures or dislocations." (R. 282, 301).

On March 19, 2001, Wilson presented to the Orthopedic Clinic stating that he still had not returned to work. (R. 298). He had tenderness in the trapezius area on the right. (R. 298). He was placed on light duty and sent to physical therapy. (R. 298). MRI dated April 16, 2001 showed a mild degenerative change of the joints at C5-6 and C6-7. (R. 428). Wilson went to the Orthopedic Clinic in early 2002. (R. 295). He was diagnosed with degenerative spondylosis of the cervical and lumbar spine (R. 295) which was confirmed by an MRI. (R. 297).

On March 16, 2006, Wilson went to the emergency room for back pain and an x-ray taken of his lumbar spine was negative. (R. 376-378). On November 28, 2007, Wilson again presented to the emergency room following an automobile accident complaining of right trapezius and right cervical muscle discomfort. (R. 364). An x-ray of his cervical

spine showed "questionable tiny avulsion fracture of the spinous process of C7 seen only on the steep oblique image." (R. 370). Wilson followed up with Herring Spine and Rehab. (R. 305). An x-ray showed "no signs of scoliosis or degenerative changes in the patients' cervical spine." (R. 309-310). He was advised to complete four to six weeks of conservative therapy. (R. 310).

On February 7, 2008, Wilson presented to the emergency room at East Alabama Medical Center for blood in his urine and a swollen right testicle. (R. 352-361). He was diagnosed with right orchitis and urinary tract infection-hemorrhagic cystitis. (R. 355). On December 29, 2010, Wilson was treated at East Alabama Medical Center for muscle spasms following a car wreck. (R. 337-351). X-rays of the lumbar spine showed minimal scoliosis. (R. 349).

On March 23, 2011, Dr. Slavich, a physician at the Institute for Advanced Cardiovascular Care, performed a consultative examination on Wilson. (R. 316-317). He diagnosed "lumbar strain with good functional capacity." (R. 317). Dr. Slavich opined that Wilson "does not have significant impairments to preclude him from doing work related activities . . ." (R. 317).

After his alleged onset date of November 19, 2013, Dr. Meka performed a consultative examination on Wilson on July 28, 2014. (R. 387-392). On exam he noted "3/5 strength in flexion and extension in all extremities" and an "intention tremor noted when assessing strength." (R. 389). Dr. Meka assessed

> [Wilson] ambulated with the use of a cane in the office today. He exhibits a slow, unsteady gait. He exhibits moderated difficulty arising from a seated

7

position. He exhibits moderate difficulty climbing onto the exam table. He
has limitation in strength assessment in all extremities.

(R. 390). Dr. Meka stated, "primary diagnosis for disability is neck pain, lower back pain, leg pain and stiffness and bilateral hand pain and stiffness. The etiology of the spinal pain may be degenerative changes with referred symptoms to his hands and legs." (R. 390). Range of motion was reduced. (R. 391). X-ray of his right knee showed no arthropathy, (R. 394). X-ray of his hip showed no arthropathy. (R. 394). X-ray of his lumbar spine showed minor scoliosis and no arthropathy. (R. 396).

On September 17, 2014, Wilson presented to Mercy Medical Clinic for neck pain down into both legs. (R. 399). He also complained of "occasional urine incontinence." (R. 399). On exam, he had positive straight leg raises bilaterally. (R. 399). Again on August 24, 2015, Wilson went to Mercy Medical and reported having neck, back, foot and leg pain for years. (R. 403). He reported continued problems with incontinence stating that "he can't get to the bathroom in time." (R. 403). He also complained of difficulty balancing and using stairs. (R. 403). He was diagnosed with chronic back and leg pain and urinary incontinence. (R. 403).

On December 15, 2015, Dr. Raymond Godsil at the Orthopedic Clinic evaluated Wilson. (R. 406). X-rays of the lumbosacral spine were normal and x-rays of the cervical spine showed degenerative changes at C5-C6 and C3-C4. (R. 406). Dr. Godsil further noted x-rays showed "some calcification of the annulus fibrosis anteriorly. Posteriorly, there is some mild posterior spurring." (R. 406). On exam Dr. Godsil noted as follows:

> Exam of the neck reveals a normal cervical lordosis. The patient moves the
> head and neck feely during the questioning part of the exam. *He has flexion*

8

*to 50 degrees, extension 35 degrees. Lateral rotation on the right 40 degrees, lateral rotation to the left 30 degrees. Complains of pain especially with rotation. Compression on the head causes pain in the lumbosacral area.* Deep tendon reflexes of the upper extremities are equal and physiological. No atrophy or fasciculations of the upper extremity. Any movement of the shoulder causes pain the lumbosacral area. *Rotation of the dorsal spine causes pain the lumbosacral area. Exam of the lumbar spine reveals touching the skin causes complaints of severe discomfort. There is slight flattening of the lumbar spine.* Deep tendon reflexes of the lower extremities are equal and physiological. Sitting straight leg raising is negative bilaterally.

(R. 415). (emphasis added). On May 16, 2016, Wilson presented to the emergency room complaining of back and foot pain. (R. 441-446).

## V. ADMINISTRATIVE FINDINGS AND CONLCUSIONS

Wilson was fifty-two years old when the ALJ rendered his decision. (R. 21, 168). He had a seventh-grade education and had worked as a cloth inspector, laundry manager, material handler, and delivery driver. (R. 32, 59-62). Plaintiff's license was suspended due to a DUI in 2013; thereafter, he stopped working as a delivery driver. (R. 39). Plaintiff alleged disability beginning on November 19, 2013, due to his back, a disc, and pain down his legs. (R. 168, 195).

At the hearing before the ALJ, Wilson testified that he could not afford to go to the doctor. (R. 48). He saw Dr. Godsil because his stepsister paid for him to go. (R. 48). He also testified that he has gotten some treatment from Mercer Medical, an indigent care facility. (R. 49). He told the ALJ that his condition now feels worse than when he got hit with the forklift. (R. 49). Wilson uses a cane to stand and walk that his sister bought for him; it is not prescribed. (R. 41). Wilson is not married and has no children under 19. (R. 50). He lives in a trailer with his stepsister. (R. 51).

9

The ALJ found Plaintiff had the medically determinable impairment of minor scoliosis of the lumbar spine, a questionable history of urinary incontinence, and mild degenerative changes of the cervical spine. (R. 14). However, the ALJ found Plaintiff did not have an impairment or combination of impairments that had significantly limited (or was expected to significantly limit) his ability to perform basic work related activities for 12 consecutive months. (R. 14). Therefore, the ALJ found Plaintiff did not have a severe impairment and was not disabled. (R. 14-21).

## VI. ISSUES

**1.** Whether the ALJ erred by substituting his opinion for that of a medical professional?

**2.** Whether the ALJ erred by failing to find any severe impairments?

**3.** Whether the ALJ erred by failing to provide Wilson with a non-adversarial proceeding?

## VII. ANALYSIS

Wilson argues that the ALJ's decision finding him not disabled because he did not suffer from any severe impairments is not based on substantial evidence. Further, Wilson argues that, in determining he did not have a severe impairment, the ALJ implicitly found that his condition remained the same in severity from 2001 through 2016. Wilson claims this is error because the medical records following his alleged onset date, November 19, 2013, demonstrate the severity of his condition and its deterioration over time.

A severe impairment is an impairment that significantly limits a claimant's abilities to do basic work activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii). As the Eleventh Circuit

explained in *Brady v. Heckler,* 724 F. 2d 914, 920 (11th Cir. 1984), "an impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." In other words, "Step Two is a threshold inquiry. It allows only claims based on the most trivial impairments to be rejected." *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986). As such, Plaintiff's burden in establishing a severe impairment is "mild." *Id.*

Upon careful review of the ALJ's decision, the undersigned concludes that the ALJ improperly applied the "slight abnormality" standard at Step Two by holding Plaintiff to a more than "mild" burden to establish that he suffers a severe impairment. The court notes that, while the ALJ carefully summarized the medical evidence of record, the ALJ nevertheless failed to acknowledge and materially address evidence that Plaintiff's condition had deteriorated over time. This is especially important considering that the ALJ appeared to base his finding that Plaintiff does not suffer any severe impairments on the fact that "claimant successfully worked for many years with his allegedly disabling impairments and symptoms." (R. 16, 18). For example, while a 2001 MRI of the cervical spine showed "mild degenerative change of the uncovortebral joints at C5-6 and C6-7," (R. 428), and a 2007 cervical spine x-ray showed "no signs of scoliosis or degenerative changes in the patient's cervical spine," (R. 309-310)*,* a 2015 cervical spine x-ray showed mild posterior spurring and calcification of the annulus fibrosis and "Degenerative changes at C5-C6 and C3-C4." (R. 406). In other words, while the earlier MRI showed "mild" degeneration, later x-rays showed spurring and calcification that was not noted in the prior

11

imaging, as well as degenerative changes at additional locations on the cervical spine. Moreover, upon examination in 2015, Dr. Godsil found decreased cervical extension and lateral flexion both directions. (R. 415). Thus, even if Plaintiff worked for a number of years after imaging in 2001 and 2007 showed only mild degenerative changes in his spine, later imaging that showed continued and additional deterioration strongly suggests that Plaintiff's condition was worsening, even if only slightly.

While these findings certainly do not establish disability, when considered in conjunction with Plaintiff's complaints, they show that Plaintiff's claim of disability related to his back is more than "trivial." Accordingly, the court concludes that the ALJ improperly held Plaintiff to a higher burden at the "threshold" inquiry of Step Two, and that remand for a proper application of the "slight abnormality" standard for determining whether an impairment is severe is in order. *See McDaniel,* 800 F.2d at 1031 (remanding for proper consideration of the *Brady* standard where "[a]lthough the ALJ made a careful consideration of the record, he appears to have required . . .[Plaintiff] to meet a higher burden at step two than *Brady* requires.").

Because the court concludes that the ALJ erred by terminating his analysis at Step Two with a finding that Wilson did not suffer from any severe impairments, the Court pretermits discussion of the remaining issues. However, it is not clear to the Court at this time whether the ALJ's conclusion that Plaintiff is not disabled will be altered by the application of the remaining steps in the sequential evaluation. Accordingly, the Court will not reverse and remand for an award of benefits. Rather, the Court concludes remand is appropriate so that the ALJ can properly apply the *Brady* standard and, if appropriate, apply

the next steps in the sequential evaluation mandated by the Regulations. *See Brady,* 724 F. 2d at 921.

## VIII. CONCLUSION

Accordingly, for the reasons discussed, the decision of the Commissioner will be REVERSED and REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) so that the Commissioner can conduct additional proceedings consistent with this opinion.

A separate judgment will be entered.

DONE this 4th day of October, 2018.

/s/ Wallace Capel, Jr.
CHIEF UNITED STATES MAGISTRATE JUDGE